v. Huntington Ingalls, Inc. May it please the Court, Ryan Andrew Kovics, Wallen Associates, on behalf of the petitioner Tom L. Mays. We thank the Court for this opportunity to present our case at oral argument today. The case has been extensively briefed, and so we would like to emphasize two points today. The first is the introduction of certain admissions in the court record below. That's the Fifth Circuit case Securitas that we've emphasized in our brief. And the second point we'd like to emphasize today is the interaction between the Phillips case, the BRB case, and the reuse factors. And so on each of these bases of reversal that we've urged at various points in this case independently warrant reversal, but we think that all taken together, they're overwhelming. But the first thing is Securitas. We have two sets of admissions in this case. We have an informal set of admissions that were made in correspondence by the respondent employer having to do with the co-employment relationship between the petitioner herein and his assailant. Those were made in correspondence by the investigators, by members of the company that were writing to U.S. Congresspersons saying that the assailant was a co-employee. But we also, more importantly, have formal admission in discovery. We asked, this is CX43, page 3, request for admission number 10. The request was claim it's accident arose out of a physical altercation with a co-employee who was also working at Employers Avondale site. That was admitted. There was no withdrawal. There was no amendment. There was no objection. Yes, ma'am. Where are both of these in the record? We have a bunch of boxes and I think we're missing a box, and people have been made aware. Where can we find these two things you're talking about? Okay, yes, Your Honor. Specifically. Specifically. So they should be in the OALJ exhibit books that were submitted up in Covington. Those were transmitted to the BRB. Okay. Do you have a page at the record that we can find these things? Yes. So the formal admission is CX43. That's claim it's exhibit number 43 at page 3. That has the formal request for admission and the defendant's answer or the respondent's answer. The informal admissions, they're in documents that were produced in discovery, and so some of those are at Employers Exhibit 26, roughly pages 4 through 9. Those are like statements taken and they're handwritten from Covington. But you don't know where on the record and appeal these things are. I don't think these agency records are paginated, so we don't actually have a page citation. My understanding from the clerk's office is there's 13 boxes, something like that. Right, and we only have 12 of them, and I'm just trying to find these documents. And so there should be our exhibit books, both the employers' and our exhibit books, that were submitted to the ALJ and then transmitted to the BRB. If there's a BRB box, I would assume that would be for the most recent appeal. So in the same spirit, can I just confirm something on the record? Of course. Page 40 of the red brief. Page 40 of the red brief. The other side quotes an RFA, which appears to be the opposite of what you said. Do you disagree? Is this an incorrect quotation from the record? I'd give you time to look at page 40. I want to make sure we're on the same page. So that's page 40 of the brief, and it's a request for admission. Request number 11, the co-employee aforesaid was a statutory or borrowed employee of claimant's employer. Response to request number 11, denied. Thank you, Your Honor. I appreciate that. First of all, there's a big nail down. Is this a misquote? No, absolutely not. So I can explain. You're not disputing that. Okay. So there's a request for admission. Now please explain. Thank you. So request for admission 10, we asked about is the altercation arises with a co-employee. That's number 10. Number 11 was more on point about this co-employee from number 10. Your focus is on number 10. Number 10, which is admitted. Okay. But 11 is? We read RFAs charitably in context? I don't know if we have to read it in paramateria because the denial of 11 has no preclusive effect. That's a live issue apparently because it's denied. Whereas the admission of number 10 admits the co-employee status. Maybe I need to read this more carefully, but are you basically saying that 10 and 11 are internally inconsistent? I think that one is admission, the other is a denial. So I don't think they're completely inconsistent. I think that co-employment status is a— But 11 is the more specific issue. It is. Normally the specific control is the general. Yes, but it's a denial rather than it has no continuing effect in the case, whereas the admission precludes the analysis. It's a much bigger deal than a denial. People deny things all the time. It leaves them for later argument and proof, whereas the admission has a preclusive effect going into the future. That's what we think the Securitas— You're asking us to basically refuse to let them contest the issue because of an admission. That's a pretty big deal, isn't it? It is, and I think Securitas requires that result. Securitas says that we don't go forward with the right-to-control test in the ADEA context, very similar to the Ruiz test. Of course, we worked it all up because you work everything up for trial, but you don't know which issue is going to be salient. We don't know how it's going to turn out. But that admission, we think, controls, at least on that particular issue of co-employment, which is what the Act requires. The Act does not specifically require borrowed employment. It requires co-employment. It's a person in the employee of the employer herein. So the assailant is a person in the employee of the employer, a co-employee, admitted, was not ever withdrawn, was not ever modified. It was not objected to. I mean, that's fine. I agree. The admission is ticklish, to be sure. Don't we need to read this fairly and not nitpicky? Or am I wrong about the standard? I don't know if I would use the adjective nitpicky, but law is a very technical field, of course, and so I think we have to pay very close attention to the precise details in the case. And so if the respondent was not interested in that admission being in the case, it could have been withdrawn. It has not been withdrawn. It's still there. There's been no motion filed at any stage in this proceeding to get rid of it. It's just a lot of argument on, you know, about how it shouldn't be taken literally. It shouldn't. You have a case where we found a judicial admission in the face of an internally inconsistent situation like this? I'm not aware of that case, Judge. I'm sorry. Normally, judicial admissions are pretty explicit. This is admittedly not nearly as explicit as it could be. I'm not aware of the case, Judge. I mean, Securitas, they worked up, however, the rest of the analysis, and the Court said that analysis for a right to control test should not have occurred. The admission was enough to establish a compliment status, and the important point of that is that that was a live issue in front of the Court. The Court should have taken that admission and its effects into account. That was the important, I think, holding of that case. And I don't think it's a very radical proposition. It's basically what's at stake in that. What's at stake are the procedural rules in federal court. Admissions have to be given effect. Litigants are entitled to rely on admissions of their adversaries. It closes out the issue. We don't worry about it. We move on to the next thing. This is, I guess, an affirmance on that issue means that the admissions don't need to be taken seriously. I mean, I think that's fairly radical. We're urging a very— I don't think I'm refusing to take it seriously. I'm sorry? I'm trying to properly construe the admission, just to be clear. Of course. Our second point has to do with the interaction of Phillips and Ruiz. The Phillips case is a BRB case, and it involves—I guess, for us, it's a common-law analogy. It doesn't get into the Ruiz factors. It reverses a finding of a third-party status, and it pulls in an employee into a co-employment or borrowed-employment situation based on the fact that these people are all different subcontractors working on a confined environment in a platform, and they are found to be co-employees, borrowed employees by the platform owner. It's almost as though we don't want to get lost in the trees of Ruiz. We want to pay attention to the forest in Phillips. And so that's kind of like a guidepost for us, and we think that on its face is enough to warrant reversal because it's a very similar set of facts. It's an isolated environment inside a ship at the Avondale shipyard. You acknowledge it's a deferential standard here? I'm sorry? As to the facts and the conclusion about borrowed employee, you acknowledge that it's a deferential standard of review that we're applying? Deferential standard of review. Well, we're not challenging the factual determination, so we don't think we're in the substantial evidence standard. This is a challenge. We've raised the appeal based on the facts found by the judge and as articulated by the BRB, and we're saying that it is a de novo standard of review to review. Well, let me try this another way. Do you dispute that Mr. – is it Gliot? Is that how you pronounce it? We say Glio, but I think— Glio? My apologies. You don't dispute that Glio's immediate supervisor was not Avondale, that they had two different supervisors? So the supervisors that Mr. Gliot was working under were payroll employees of IAMIA. Our position is that they would be also borrowed supervisors working at the Avondale shipyard, and the salient case on that would have been the Lamer case. In the Lamer case, the Texaco supervisors—I think Lamer, the language is something that, in fact, we don't care if it's the Texaco supervisors or the subcontractors' supervisors. This is a borrowed situation. So your view is the entire team is basically— They're over there because the standard—yes, yes, Judge. The standard under CAPS is that it's authoritative direction and control. It's not the micromanagement of everybody's daily activities. And the authoritative direction and control here would be the Avondale shipyard putting these teams to work. Irrespective of the sergeants, the general ship is done by Avondale. And so that's—and the factors—and we could go through the factors, but each of the factors for ease, there's a Fifth Circuit case right on point that controls the outcome. And we're not trying to say that the facts are found wrong in this case. We're trying to say that the facts were interpreted not in accordance with law. And so the Fifth Circuit precedent here is, you know, Melanson, CAPS, Lemaire, Brown, these cases. Most of these cases are situations where a plaintiff goes into district court suing these people in tort. In most of these cases, it's a dismissal. The exclusive remedy is raised, and these companies can rely on not being sued in tort. This case, our case, what has happened is essentially the courts below have disregarded the Fifth Circuit instruction on these— and so what we're looking at is a situation where it's implicit reversals of those Melanson, CAPS, Lemaire analyses. And what it does is instead of immunizing these companies from tort, it almost authorizes additional tort suits against the defendants, like, say, Melanson, or the defendants in CAPS, the defendants in Lemaire, Brown. Those—you know, it'd be—essentially you could take those cases out of Longshore altogether and make them into just regular tort cases. And so— Can I ask you about the cross-appeal? Because I know we're—you're running out of time. I want to ask you about the cross-appeal. Yes. Talk to me about the 33G issue. I take it there's no dispute the other side never consented, never signed the settlement. That— Yeah, our understanding is that there was no consent. Okay. So just explain to me, because I had trouble following the argument. Why—what is your contention that 33F rather than 33G apply? My understanding of the issue there is that it has to do with, I guess, the procedural status of this. It's—we have an old BRB opinion saying that 33F was the current, I guess, statute in effect for the case. And because the modification proceeding that we brought and tried in December of 2015 was ultimately denied, there was no modification of that order, the judge worked up, you know, the amount that would be due, provided benefits have been granted retroactive to the date of injury, and found that that amount would have been greater than the purported settlement in state court and therefore said that G, you know, would apply there. So that, you know, either way, whether you—if you win the amount or not win the amount, you're still in the same situation. So the modification's denied. I think that means that G is not actually in effect. I think that means F is in effect. I think that's our position. But I think that would also be something to be taken up not at this stage, but I think that's taken up maybe on remand, even at the informal level. But, yeah, I think I was—yeah, so I have time. As far as the Ruiz analysis goes, the Fifth Circuit cases, these things have been in effect a long time, decades, some of them, Melancon, Caps, Brown, Lemaire. These cases have been around. Entities all through the Gulf, up and down the river have relied on them. And to affirm here is to essentially, you know, shake that reliance. It disturbs a lot of settled precedent. This is not radical principles that are being disturbed by this case. What you have is a lot of companies that rely on this, and a lot of employees should be entitled to rely on that too. You know, in this case, the petitioner is relying on this law to pull his assailant into the Loan Share Act. For these reasons, we would ask that the Court reverse the amendment. And if there's any other questions, I would— Thank you. We have your argument. Thank you very much. May it please the Court. Richard Vail on behalf of Respondent and Cross Appellant Huntington Ingalls. As the Court is aware, this is an appeal from the BRB affirming a decision of the Administrative Law Judge finding that Mr. Gliad was a third person and not a borrowed servant. And therefore, Mr. Mays' benefits should be forfeited pursuant to 33G. The standard review in these cases is limited in scope to considering errors of law. Making certain that the BRB adhered to its statutory standard review of factual determinations, that is, whether the ALJ's findings of fact are supported by substantial evidence and are consistent with the law. Substantial evidence is that relevant evidence, more than a scintilla, but less than a preponderance that would cause a reasonable person to accept the fact finding. In this case, the Administrative Law Judge considered the Ruez factors and found that they did not support a borrowed servant situation. The BRB affirmed that decision, although they did not find as many factors that did not favor borrowed servant status as did the Administrative Law Judge. But it was clear that based on the Administrative Law Judge's findings of fact and conclusions of law in this case and the BRB that they held Mr. Gliad was not a borrowed servant. And as Pellin has admitted, they're not disagreeing with any of the facts in this case. They're just disagreeing with the conclusions that the Administrative Law Judge and the Benefits Review Board derived from those facts. Could you talk about factor eight of the Ruez test? The control factor? The right to discharge the employee. That's eight in the Ruez? Yes, Your Honor. Yes, I believe so. If I've got the number wrong, can we still talk about it? That's all right. I thought you said eight. I thought it's eight. Eight, yes. That's what I have it down as is eight. Yes. Okay. You say that your client couldn't force IMIA to fire Gliad, so no borrowed servant status. But under caps in other cases, the right to discharge is simply the right to keep them from doing relevant work. That's correct, Your Honor. You could have kept him from being on the work site doing work. That's correct, Your Honor. So that cuts against you. Yes, Your Honor. Okay. In fact, the BRB found eight. I'm sorry. I thought you said eight. Okay. I just wanted to make sure we're all in the same place. Because you say at some point that that's the other way. The BRB found that factor eight favored borrowed servant status. But that was the only one that they said favored borrowed servant status. And I would argue even in that situation, as long as they cannot fire the employee but only say that he can't work on their premises anymore, should not satisfy or favor borrowed servant status. Our case law already does do that under caps. For factor eight, it does. We have to follow our case law's interpretation of factor eight. That's correct, Your Honor. But what all of the cases say from Ruiz on is that you've got to look at the big picture. You've got to look at all of the factors and not single out one as more important than the other in order to determine who had control of the employee. And so eight does have a factor to help indicate control, but you've got to look at all of these factors in total. And in most of these situations, the cases that the appellants have asserted dealt with contract laborers, temporary employees who the first employer loaned them on to the second employer, lost control of them, didn't supervise them. They were supervised by the second employer. The second employer could fire them. The second employer paid them hourly based on their work. And these temporary employees, knowing they were being loaned to the second employer, acquiesced in the work environment. And so those factors all support parole serving. But in this case, Mr. Gliot was supervised by his own employer. In fact, there were five supervisors. He wore a different badge than those of the Avondale employees. He wasn't paid hourly. In other words, Avondale didn't say, how many hours did Mr. Gliot work? We're going to pay him for that. They paid IM for the tasks that they were to perform, which was specialized, where they brought their own equipment, especially the scaffolding, which was specialized for their work. Mr. Gliot remained under the control of International Marine, his direct employer. He never acquiesced in the work. In fact, there's a quote in the Goday case, which does fine-tune or refine the Ruiz factors as the ones that might be more important. In the Goday case, they said that if the employee is doing work and goes to another site and is doing that same kind of work for his employer, then he does not appreciate all the risks of the new environment, and therefore does not presume that he acquiesced in his work environment since he's doing the same work for IM. Then after this job, 90 days in length, he left Avondale and went on with International Marine to the next job. The administrative law judge found eight of the nine factors in favor of not being a borrowed servant, finding that number two was neutral. The BRB found several of these factors in affirming that decision to not favor borrowed servant, although they did say in their decision that factor eight did favor borrowed servant status. If you look at this case in its total, he was supervised by IM. In fact, there was not even one Avondale supervisor that was identified as part of the working crew. He did not acquiesce in his employment since he remained under the control of IM. IM did not terminate its relationship with Mr. Goliath since they supervised him and continued to pay him. Again, they furnished the tools and specialized scaffolding, and the employment was for 90 days. Once those days were over, Mr. Goliath did not expect to stay at Avondale, which he didn't. He went on to work for IM somewhere else. All those factors under the Ruiz test, I think, were correctly interpreted by the administrative law judge and the Benefits Review Board. Can you address the opposing counsel's argument that if we were to rule for you, that this would cause a problem in our tort law and caps and the lawn saw, and that this is somehow at odds with that, and that we're going to be upsetting the whole liability issues and expand liability greatly? Do you want to address that? I don't think what the administrative law judge concluded, which the BRB affirmed in any way, goes contrary to Ruiz, Godet, lawn saw, and all the other cases they cited. Again, most of the cases they cited dealt with temporary employers, contract laborers. This was not the situation here. When you pull back from looking at one or two or three or four of those factors and look at the big picture, it's clear that the administrative law judge's conclusions were correct. Why hasn't the admission been withdrawn or requested to be withdrawn at any point? We think we did that in the very next response to the request for it. But once it became clear that it was a stumbling block, even in this, why wasn't some effort made to withdraw an admission? That's a normal thing to ask for. If you have an admission that's turning out to be contrary to what you're saying. I guess that might have been the most prudent thing to do, but the administrative law judge found that what they were trying to do was taking that response to that request for admission out of context. No time have we admitted that Mr. Gliot was the boiled servant of Avondale. The BRB rejected that argument as well and went on to say that as far as the letters and all that that were sent early on in this case, I assume the Court is aware this is a case that's 28 years old, that some of this correspondence, it didn't say he is our boiled servant or he is our employee. They just referred to him as employee. In the Nicholas case that the appellant cite, in that case the defendant and the Court found that there was an admission in the contract, there was an admission in the answer, and there was an admission and they conceded that point in their post-trial briefs. This is the issue in this case at this point in time, which the appellant has raised 25 years after the case first occurred regarding boiled servant status. I think it would honestly be very unfair that this whole case be determined based on one inartful response and a request for admission. What was the actual response to the request? The question was, was Mr. Mays injured by a co-employee in the course and scope of his employment? And that was admitted. And then the next question… He used the word co-employee. That's what they referred him to. And then in the very next question they asked, was Mr. Gliot your boiled servant? And that was denied. And I would like to cite to the Court two cases which are not in our brief, for which I apologize, but they're both from this circuit. The first one is Martinez v. Bally's. Did you give these to the other side today when you got here? No, Your Honor, I just found these, well… You found them while you were sitting here this morning? No, no, no, no. You couldn't have given them to them before you started? No, Your Honor, I have not provided them to appellate. Well, you can proceed, but you have a right in two business days to submit a 28-J in response on these cases. That's a better practice. You don't spring cases on people at oral argument. I apologize, Your Honor. Martinez v. Bally, cited at 244, Fed Third, 474. And what Martinez says in regards to judicial admissions, it has to be an intentional act. And then in Heritage Bank v. REDCOM, cited at 250, Fed Third, 319. They also, this Court also defines judicial admission and says that it must be deliberate, clear, and unequivocal. And so, admitting that Mr. Mays was injured in the course of Scobie's employment by a co-employee is not intentional, deliberate, clear, or unequivocal that we're admitting that he's the borrowed servant of Avondale in this case. So, it's our position that those cases, along with what the administrative law judge concluded from the facts and the BRB concluded from the facts, that the penultimate issue in this case should not be resolved or decided by one inartful response to one request for admission. Counsel, do you have anything else? The cross appeal, Your Honor, I'd like to speak on that for a second. And then if I have time, I'll talk about Phillips. Essentially, before the last hearing, after the third-party settlement, we applied for Section 33G relief, which under Cowart says that if there's an unapproved third-party settlement, the claimant forfeits all benefits, medical and compensation, if the settlement is for less than what the exposure would be under the Longshore Act. The administrative law judge initially granted our Section 33G relief request. On reconsideration, he said, well, since the settlement was for $60,000 and your liability up to this point is only $5,000, we're going to give you 33F instead of 33G, which means we get a credit. And under Villanueva, the Fifth Circuit says, you know, it really doesn't matter whether it's 33F or 33G because in either case, the obligations of Longshore benefits should be extinguished. But it's important in this case because the administrative law judge said that 33F only applied to disability benefits, not to medical benefits for which we remain exposed. So then in this case, after the hearing, the administrative law judge found that there was a change in circumstances, found claimant to be entitled to now more benefits, found that those benefits exceeded the third-party settlement, and therefore Section 33G should apply. And he said just above the order in his findings, accordingly, Section 33G mandates forfeiture of disability and medical benefits. Therefore, claimant's request for modification is denied as lacking merit. And then the order says based on the foregoing, he dismisses the Section 22 modification. What the BRB did and interpreted under a very strict situation was with the order dismissing the Section 22 modification, gave no effect to the fact that the administrative law judge had awarded us 33G relief, whereby claimant forfeited his medical and compensation benefits from the date of the signing of that third-party settlement. What's really puzzling is that the Benefits Review Board previously in 2003, when they remanded the case for this issue, said to the administrative law judge, look at the fact that if you do award benefits, that additional benefits that are greater than the third-party settlement, then you need to consider 33G. So the BRB predicted exactly this situation. The administrative law judge heard the facts, awarded benefits greater than what the third-party settlement was for, and therefore asserted that Section 33G went into effect whereby Mr. Mays's benefits were forfeited. And the fact that the BRB did not give that language the reading that it deserves is what we're here on cross-appeal about, is that it's clear from just a basic reading of the decision and order that the administrative law judge did say that Section 33G was triggered mandating a forfeiture of benefits. What do you want us to do about it? To simply state that in giving full effect to the administrative law judge's decision and not with respect to the strict interpretation given to it by the Benefits Review Board, it is clear that there was an unapproved third-party settlement for an amount less than the compensation award, and therefore Section 33G mandates forfeiture of disability and medical benefits. If we agreed with you, just assuming arguendo, but we thought we should send it back for them to do that, why would that be wrong? That's one alternative option. Although being that the case is 27 years old and it's been appealed and remanded four or five times, I'm asking for a little assistance here from this Court to simply recognize what the administrative law judge decided and ordered in this case, that there was an unapproved third-party settlement for less than what the compensation exposure was based on the Section 22 modification. Where does that leave the worker today, if you're correct? He would be able to go back to the administrative law judge and ask for benefits from the time that compensation was terminated in August of 1991 up to the date of the third-party settlement, which was January of 2000, because the administrative law judge found there was a change in circumstances and awarded him greater benefits. The only problem was once he confected that third-party settlement without the approval of the employer, he forfeited all future benefits, comp and medical, based on... How much is he forfeiting? Well, that's from January of 2000 onwards. I haven't calculated what the future exposure would be in that case. I think the point of 33G is if there's going to be a settlement with a third party, the employer should have an opportunity to participate in case it's too low of a settlement. It's very clear that the employer is rarely protected in these kind of situations where there's a third-party tort suit. And so under Cowart, they made it very clear that, you know, if you affect the employer's rights to get their money back from the third party that caused it... The fear is the settlement's not as generous as it should be. Exactly right. So the employer's essentially foregoing an opportunity to recover. And they finally brought up this issue in 2015. This unapproved third-party settlement by a co-employee wasn't even in existence or in the conscience of this case until 2015 when they were trying to figure a way around 33F. And so they gambled and hoped that the court would find that Mr. Galea was the borrowed servant and therefore the settlement would not be able to invoke 33G. Thank you, counsel. We have your argument. Thank you, Your Honor. You've saved time for further argument. Thank you, Your Honor. My name is Isaac Swallow. I also represent the petitioner, Mr. Mays. I'd first like to address some of the questions and issues that have come up in the previous argument so far. Talking back, if you would, to Judge Ho, you had asked about whether or not the request for admission, number 11, was more specific than number 10. And quite frankly, we think they're both very specific to very specific issues. Number 10 asks whether or not they were co-employees, the two men involved in the altercation were co-employees. That was admitted. It's never been taken back. It's never been withdrawn. It's never been asked. Ten's about a lot more. Say again? Ten's about a lot more than the status, whether it's co-employee, borrowed employee. Ten is about a whole set of facts. Correct. Eleven is just about the one question, what do we call this person? Eleven is about, well, not what we call this person because what we call this person in ten is co-employee. But ten is about a lot more than that is my point. It's about whether or not there was an altercation between co-employees. That's all I'm saying. Okay. Thank you, Judge. What we're saying in number 11 was basically the ultimate issue of whether or not this is a borrowed employee as well, whether he admit he's a borrowed employee. But here's, when you look at the analysis, when you look at employment law in general, Ruiz-Godet, what Ruiz-Godet is actually intended to do is to provide courts, provide litigants an opportunity to determine the employment relationship. In this matter, that employment relationship is a triangle. It is whether or not there's a co-employee status or whether or not there's a borrowed employee status. Under either scenario, we get to the part that we need, that Mr. Mays is arguing, that 33A actually applies, that it was a co-employee who injured him and, therefore, Section 33 of the Act is not applicable. All of the argument about third party, none of that was ever an issue in the State court case. None of that was an issue in any of the prior case until after the motion in 2002 was raised about 33G. No facts were ever rendered in the ALJ area or before the BRB concerning that. It was just assumed this is a third party. That is the purpose of the Section 22 modification, to get the facts right. And that is why in 2005, originally, and then subsequently in 2006, when it was refiled, Mr. Mays, on his own, without legal representation, kept his claim alive by filing these Section 22 modifications. The Section 22 modification allows the courts to correct facts. We believe that we properly briefed through as. We believe that, for instance, Mr. Vail was talking about there was no acquiescence. The fact that Mr. Glio lives in Alabama but drives all the way over to Avondale and the West Bank of New Orleans area tells you that he knows his condition has changed and he knows that he's working in a new environment. And acquiescence is whether or not the actual, your jurisprudence. Acquiescence involves whether or not he actually consented or did he complain about it. For 90 days, he didn't complain about it. For 90 days, he continued to do his work. We think that the Ruiz factors, as we briefed, follow all of your own precedent. And as such, that shows that he was a barred employee. Further, we think that the Securitas case is a separate way of actually accomplishing the same task. Under Securitas, when an employer admits to an employment relationship, co-employee, and we would argue is an employment relationship, that basically should predomit the Ruiz analysis. Nothing further. We think, really, the Ruiz analysis here showed the facts are more in favor of barred employee than not. As to the 33G argument that Petitioner—I'm sorry, that Respondent has raised in their cross appeal, whether or not 33G should be applied, we would argue it should not. We think the BRB actually got it correct. A modification seeks to change facts or findings in previous rulings. The judge in the ALJ found a lot of different things, but ultimate decision was the modification was denied. The effect of a denied modification is that the prior rulings are still in effect. That is why we think the BRB got that correct, and this matter is essentially— Put aside the procedural history, which is obviously complicated and decades long. Why shouldn't 33G apply? 33G shouldn't apply in this matter, quite frankly, because we think our 33A argument is the correct argument. They were co-employees. Therefore, 33 doesn't apply at all. It does not harm Avondale— No, Your Honor. They intervened into the lawsuit. Is there anything else within 33G that you would argue, or are you simply making an argument outside of 33G? Making an argument outside of 33G as to 33A. As to whether they were involved, they intervened—I'm sorry, Your Honor, my time is up. Can I finish? Answer the question. They intervened into the underlying lawsuit. They participated in the settlement negotiations. They paid off the liens to ensure that the settlement would go through. They were fully aware of it, and, in fact, they used the Ruiz-Gordy factors when other IMIA employees sued them directly in tort, including they used the Louisiana Statute of Defense in the case entitled Higginbotham— I'm sorry, entitled Grantham v. Avondale, which Judge Higginbotham authored in 1992. They were fully aware of how this works as well. Thank you, Your Honor. We appreciate the time and our argument. Thank you very much. We have your argument. This case is submitted. This concludes oral argument for this session of the court this week, and the court will stand adjourned pursuant to the usual order. Thank you.